Joanne M. YOUNEY, Plaintiff,

v.

Joanne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 02–CV–6328L.

United States District Court,
W.D. New York.

Aug. 6, 2003.

Christopher M. Mesh, Esq., Connors & Ferris, LLP, Rochester, NY, for plaintiff.

Brian M. McCarthy, AUSA, United States Attorney, Rochester, NY, for defendant.

### DECISION AND ORDER

LARIMER, District Judge.

### I. Procedural Posture

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security ("the Commissioner"), who determined that Joanne M. Youney ("plaintiff") is not disabled under the Social Security Act ("the Act") and, therefore, is not entitled to benefits. Plaintiff applied for benefits under Titles II and XVI of the Act on March 6, 2000 claiming that she was disabled as a result of a work-related accident which occurred on December 13, 1999 (T. 72–74).[1] Her application was denied both initially, (T. 44–50), and upon reconsideration (T. 53–56). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 20, 2001 (T. 27–39). The ALJ, after considering all of the evidence, decided that plaintiff was not disabled under the Act (T. 11–15). The decision of the ALJ became the final decision of the Commissioner on May 22, 2002 when the Appeals Council denied plaintiff's request for review of the ALJ's decision (T. 3–4).

Plaintiff timely appealed the Commissioner's decision and the action is, therefore, properly before this Court. Both plaintiff and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and, for the reasons discussed below, the Commissioner's decision is reversed, and this matter is remanded for further proceedings consistent with this opinion.

### II. Factual Background

Plaintiff is a forty-three year-old female with a high school education and some college credit (T. 28). She has worked as a medical records clerk and a veterinary assistant (T. 120–21). In December 1999, after a period of unemployment, (T. 29), plaintiff began the latter job, which involved feeding and caring for animals (T. 28–29). At that job, on December 13, 1999, while cleaning the kennels, plaintiff

---

1. "T.___" refers to the page of the administrative transcript filed by the Commissioner.

injured her back and right shoulder. Within a few days of the accident, plaintiff went to her physician, David W. Sanchez, M.D. The doctor ordered x-rays, which proved to be negative. He also prescribed heat and several medications and directed plaintiff not return to work for one week (T. 128). Plaintiff saw Dr. Sanchez twice more before mid-January 2000 complaining of "pain shooting up and down [her] back [and] legs" (T. 127). Dr. Sanchez kept plaintiff from returning to work and referred her to a specialist, Andrew J. Palafox, M.D. (T. 127).

Plaintiff's initial visit to Dr. Palafox was on January 12, 2000. The doctor tested plaintiff's back flexibility, which was generally below the normal ranges and accompanied by noticeable pain. Dr. Palafox noted that there was no atrophy of the lower extremities, and plaintiff's right shoulder showed full range of motion (T. 198–199). Dr. Palafox began conservative care by administering an injection of pain medication and prescribing other medication and physical therapy (T. 198). Plaintiff attended physical therapy, but was dropped after seven sessions at the therapist's behest because of three consecutive "no-shows" (T. 133). Records of plaintiff's visits to the physical therapist show that many of the activities involved in the physical therapy increased plaintiff's pain (T. 135–36).

Plaintiff returned to Dr. Palafox on February 2, 2000 complaining of "severe exacerbation" of the pain in her lower back, whereupon the doctor ordered magnetic resonance imaging ("MRI") (T. 196). The results of the MRI were reported on February 11, 2000 by Bruce P. Foreman, M.D., and showed that plaintiff suffered from L5–S1 left paracentral annular fissure and mild degenerative disc disease at that level. The report noted that this ailment could be symptomatic of plaintiff's pain (T. 194).

When plaintiff again saw Dr. Palafox on February 15, 2000, she reported moderate back pain and some improvement in her leg pain, but in light of the MRI results, the doctor suggested that she not "return[ ] to her job with lifting" (T. 193). Dr. Palafox also stated that he believed that she "ha[d] a chemical irritation to the nerve root which is consistent with the disc injury" (T. 193). Plaintiff next visited Dr. Palafox on March 15, 2000 complaining of continued pain and an inability to return to work or perform daily activities at times. Dr. Palafox noted plaintiff's "moderate/severe" pain and tenderness in her lower back and continued conservative care, with some adjustments in medication (T. 186, 192). Dr. Palafox still did not approve plaintiff for work, but scheduled her for an appointment one month later (T. 192).

On that visit, April 26, 2000, plaintiff reported that her condition was "unchanged with frequent exacerbations" (T. 185). Plaintiff's back pain was "worse and radiating into her right lower extremity," including her foot (T. 185). She also complained of severe headaches. Dr. Palafox ordered a functional capacity evaluation ("FCE") at plaintiff's insurance carrier's request. In the meantime, Dr. Palafox continued his order that plaintiff not return to work (T. 187).

The FCE was performed by physical therapist Ismael Garcia on May 4, 2000, and plaintiff visited with Dr. Palafox on May 5, 2000 before the results were available. Dr. Palafox opined that, "depending on [the] restrictions from [the] FCE," plaintiff would possibly be able to "return to some light duty" (T. 184). The physical therapist eventually concluded that plaintiff could carry only five pounds in each arm, with "poor activity tolerance." Plaintiff could lift no weight from the "floor to

[her] knuckle" ("secondary to [her] inability to squat"), only six pounds from her "knuckle to [her] shoulder," and nothing higher than that, despite assistance. While performing these lifting tests, plaintiff complained of "exacerbation of pain to [her] right shoulder [and] cervical[,] thoracic[, and] lumbar spines [sic]." Plaintiff's arm and leg control were rated "poor," and she demonstrated an ability to push and pull only five pounds. During these activities, plaintiff "demonstrated poor bilateral upper [and] lower extremity strength," an inability to "effectively stabilize cervical, thoracic[,] and lumbar spine," and complained of exacerbation of pain. Plaintiff could perform only eight repetitions in one minute, forty-eight seconds on the stair climbing test and required "upper extremity assistance by holding onto guardrails." Plaintiff's movements with her feet were rated "good." The therapist did not administer the treadmill test for safety reasons related to plaintiff's condition (T. 177–79).

The FCE summarized that plaintiff's "effort was inconsistent" because she was "symptom limited," and she "demonstrated slow[,] guarded movements throughout the activities." The report concluded that plaintiff had the following "[s]ignificant [d]eficits": "[d]ecreased static sitting, standing, overhead reaching, horizontal reaching, prolonged walking, climbing, lifting, carrying, pushing, and pulling." Despite these limitations, the physical therapist concluded that plaintiff was functioning at a sedentary work capacity level (T. 179).

When plaintiff next visited Dr. Palafox on May 12, 2000, the doctor noted the conclusion of the physical therapist, but did not change his "no work" order and ordered a neurological evaluation for plaintiff's earlier-reported headaches (T. 176). In a subsequent letter on May 25, 2000,

Dr. Palafox again acknowledged the physical therapist's conclusion that plaintiff could perform sedentary work, but, nonetheless, stated that plaintiff was "unable to return to gainful employment" at that time (T. 175). That same month, a Disability Determination Services (DDS) physician, without examining plaintiff or consulting examining physician statements, determined that plaintiff could frequently lift twenty-five pounds, occasionally lift fifty pounds, stand or walk for six hours in an eight-hour workday, sit about six hours in an eight-hour work day, and could push or pull with no limitations. That physician also opined that plaintiff had no limitations in climbing, balancing, stooping, kneeling, crouching, or crawling. Nevertheless, the physician concluded that plaintiff's "alleged limitations caused by her symptoms [were] supported by the medical and other evidence" (T. 146–53). Shortly after this, on May 17, 2000, the Commissioner denied plaintiff's application initially, stating that "[t]he medical evidence shows that[,] although [plaintiff's] injuries are currently severe, they are expected to respond to treatment and will not be disabling for 12 continuous months" (T. 50).

Luis F. Vasquez, M.D. performed a neurological evaluation for plaintiff's headaches on June 26, 2000. The test yielded "normal" results (T. 156–58). Plaintiff again saw Dr. Palafox on August 17, 2000, at which time he performed an assessment for plaintiff's worker's compensation claim. Dr. Palafox rated plaintiff's total body impairment at twenty-six percent, opining that her condition was "stable" and not expected to achieve further healing, despite "residual pain" (T. 161–62).

Plaintiff's next visit to Dr. Palafox was on September 18, 2000. Plaintiff complained of continued moderate pain and said she could not perform activities of daily living. Dr. Palafox continued conser-

vative care, scheduled a follow-up exam, and was silent with regard to plaintiff's ability to return to work (T. 160). Approximately one month later, another non-examining DDS physician, again without treating source statements, performed a second FCE. He concluded, as did the first DDS physician, that plaintiff could frequently lift twenty-five pounds, occasionally lift fifty pounds, sit about six hours in an eight-hour workday, and stand or walk six hours in an eight-hour day. He found no other limitations and concluded that the medical evidence before him did not fully support plaintiff's alleged limitations (T. 201–08).

From that point, the record contains several letters from Dr. Palafox to plaintiff's insurance company. The first, dated October 24, 2000, requested that plaintiff be reimbursed for overnight accommodations when she visited his office, which was a considerable distance from plaintiff's home. The doctor suggested that constant driving was "detrimental to her overall condition" (T. 168). Dr. Palafox wrote another letter, dated December 21, 2000 after a visit on November 17, 2000, which stated that plaintiff's condition had "deteriorat[ed] considerably" since January 2000 and requested that the insurance company pay for epidural steroid injections "as soon as possible[,] in order to allow [plaintiff] a better quality of life by at least achieving temporary relief of her pain" (T. 218).

On February 8, 2001, Dr. Palafox requested that plaintiff's insurance company provide her with a transcutaneous electrical nerve stimulation ("TENS") unit on a permanent basis. The doctor indicated that plaintiff had achieved some relief of her pain by using such a device and that she could use the machine as "home physical therapy" (T. 220). In Dr. Palafox's next letter to plaintiff's insurance company, on March 13, 2001, he described

plaintiff's ailments as "progressive" and requested an "EMG/Nerve Conduction Velocity Study ... [to] evaluate whether a modification in her treatment plan [would] be required" (T. 223). The final letter in the record from Dr. Palafox was written on April 16, 2001 and reported on plaintiff's visit of April 9, 2001. Dr. Palafox again stated that plaintiff's "condition ha[d] been deteriorating gradually" and again requested tests to determine "if a modification in [plaintiff's] treatment plan [would] be required to possibly include surgical evaluation" (T. 216).

At her eighteen-minute hearing on June 20, 2001, (T. 27–39), plaintiff testified to "throbbing and sharp shooting pains" in her back, as well as a "weak" left foot and "electrical shocks" in her right foot (T. 30–31). Plaintiff rated her pain at a ten on a ten-point scale before she began using a borrowed TENS unit, but subsequently at "a seven and a half, eight" (T. 34). Plaintiff testified that she was unable to do most daily activities, such as mopping, vacuuming, cleaning, and walking long distances without resting, (T. 33–34), and sometimes had to take a sponge bath in lieu of a shower (T. 33). Plaintiff could prepare meals and do dishes with a break (T. 36). A caretaker, plaintiff's boyfriend, helped her do "basically everything" when he was in town every third week, including buying groceries, vacuuming, cleaning, and doing laundry and outside work (T. 37).

### III. Legal Standards

#### A. "Disability" Under the Act

A person is "disabled" under the Act and, therefore, entitled to benefits when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). To qualify for benefits, the disability must be the result of an "anatomical, physiological, or psychological abnormalit[y] ... demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Such a disability will be found to exist only if an individual's impairment is "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Second Circuit has described the five-step process with which the Commissioner determines whether a claimant is disabled and entitled to benefits:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then

shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999) (footnote and citation omitted).

In the present case, the ALJ found that plaintiff was not engaged in substantial gainful activity and had not been since December 13, 1999, the date of plaintiff's accident at work (T. 14). The ALJ next found, based on the medical evidence in the record, that plaintiff's impairments were severe (T. 14). The impairments noted, however, were not listed in 20 C.F.R. pt. 404, subpt. P, app. 1 and did not equal any of the listed impairments (T. 14). At the fourth step, the ALJ concluded that plaintiff had the residual functional capacity to perform the full range of sedentary work and, thus, could return to her former job as a medical records clerk (T. 14–15). Consequently, the ALJ found that plaintiff was not disabled within the meaning of the Act.

### B. Standard of Review

The Commissioner's decision that plaintiff was ineligible to receive benefits must be affirmed if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, "[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Where the

Commissioner's decision rests on adequate findings supported by evidence having rational probative force[,]" this Court cannot substitute its own judgment for that of the Commissioner. *Veino*, 312 F.3d at 586.

 Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984); *accord Tejada*, 167 F.3d at 773. This Court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled. "Failure to apply the correct legal standards is grounds for reversal." *Townley*, 748 F.2d at 112. In its review, this Court is to first review the legal standards applied, and then, if the standards were correctly applied, consider the substantiality of the evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

## IV. Discussion

Plaintiff contends that this Court should reverse the decision of the Commissioner because the ALJ (1) failed to follow the treating physician rule by not giving plaintiff's treating physician's opinion proper weight, (2) failed to properly assess plaintiff's credibility regarding her subjective allegations of pain and impairments, (3) failed to develop the record with regard to plaintiff's alleged mental impairments, and (4) failed to support with substantial evidence his decision that plaintiff is not disabled. After reviewing the administrative record, I believe that the ALJ misapplied

the treating physician rule and inadequately evaluated plaintiff's credibility; therefore, I reverse and remand for further proceedings.

### A. Treating Physician's Opinion

 The instant case presents the opinions of four sources: two non-examining DDS physicians, an examining physical therapist, and plaintiff's treating physician, Dr. Palafox. Both DDS physicians, one in May 2000 and the other in October 2000, described plaintiff's residual functional capacity in terms consistent with a "medium" work capacity (T. 146–53, 201–08).[2] Plaintiff's examining physical therapist, based on extensive, personal testing of plaintiff's functional capacity, concluded that plaintiff was functioning at the "sedentary" work capacity level (T. 177–79).[3] Dr. Palafox, based on the data from the physical therapist's FCE, stated in May 2000 that plaintiff was "unable to return to gainful employment" at that time (T. 175).

Plaintiff contends that the ALJ erred in applying the treating physician rule by not granting controlling weight to Dr. Palafox's opinion. I agree. The ALJ failed to give "good reasons" for not affording the treating physician's opinion controlling weight.

The opinion of plaintiff's treating physician is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

---

2. "Medium work" is defined as "work [that] involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

3. "Sedentary work" is defined as "work [that] involves lifting no more than 10 pounds at a time and occasionally lifting or carrying arti-

cles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Schaal v. Apfel,* 134 F.3d 496, 503–04 (2d Cir.1998). Regardless what weight the Commissioner does give the treating physician's opinion, the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she gives the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) (citing *Schaal,* 134 F.3d at 505).

In explaining the reasons for not affording Dr. Palafox's opinion controlling weight, the ALJ offered the following:

> I am aware that Dr. Palafox stated in a May 25, 2000 letter that [plaintiff] was unable to return to work. However, I am not bound to accept even a treating physician's conclusion as to functional capacity or disability, particularly when the opinion is not supported by detailed, clinical diagnostic evidence. Dr. Palafox was aware that [plaintiff] underwent a functional capacity evaluation on May 04, 2000 and Ismael Garcial, the physical therapist, stated the [sic] she performed at the sedentary work level. She complained of headaches, but Dr. Lius F. Vasquez, a neurosurgeon, examined her June 26, 2000 and stated the exam was entirely within normal limits.

(T. 13) (internal citations omitted). The reasons advanced by the ALJ are not substantiated by the record, are based on legal error, and are irrelevant to the determination at issue.

First of all, the ALJ found that Dr. Palafox's opinion was "not supported by detailed, clinical diagnostic evidence" (T. 13). The record, however, indicates that there was strong evidence to support Dr. Palafox's opinion. His opinion regarding plaintiff's ability to work as a result of her back and leg pain was based on an MRI, (T. 194–95), an FCE, (T. 177–79), and months of patient examinations, *see, e.g.,* T. 160–63, 171–76, 184–93, 196–200, 216, 218, 221. *See* §§ 404.1512(b)(1)-(2), 404.1528(b)-(c), 416.912(b)(1)-(2), 416.928(b)-(c) (explaining what is to be considered medical evidence). Moreover, even if it were the case that Dr. Palafox's opinion was not supported by detailed, clinical diagnostic evidence, the ALJ would have been required to seek, *sua sponte,* additional information from the treating physician to determine upon what evidence the doctor's opinion was based. *Schaal,* 134 F.3d at 505.

As a further basis to reject Dr. Palafox's opinion, the ALJ appears to rely on other evidence in the record purporting to be inconsistent with his opinion. First, the ALJ points to the physical therapist's conclusion from the FCE that plaintiff could perform sedentary work. Next, the ALJ offers the "normal" results from plaintiff's neurological examination. The Court finds neither of these reasons to be adequate.

Regarding the physical therapist's report, the regulations are clear that a therapist's opinion is not considered "medical evidence," only an "other source" upon which the Commissioner can rely. *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). A single statement by a therapist, therefore, is not "substantial evidence" against which a treating physician's opinion can be deemed inconsistent. *See Green–Younger v. Barnhart,* 335 F.3d 99, 107–08 (2d Cir. 2003). This is especially true where, as here, the physical therapist's conclusion that plaintiff can perform sedentary work is inconsistent with the medical evidence contained in his own report. As noted above, the report lists significant exertional and non-exertional limitations which support a conclusion that plaintiff can only

do less than the full range of sedentary work. *See* Social Security Ruling 96–9p, 1996 WL 374185, *5–10 (S.S.A.) (explaining the exertional and non-exertional limitations that would support such a finding). In addition, it appears that the ALJ did not have before him a complete copy of the FCE. Pages numbered two and three are missing from the record. *See* T. 177–79. Notably, the portion of the FCE in the record, although otherwise comprehensive, does not contain any analysis of plaintiff's ability to stand, walk, or sit. The report, therefore, is inadequate to fully support or refute any opinion.

Regarding the second piece of evidence cited, the record reveals that plaintiff's neurological evaluation was performed to ascertain the cause of plaintiff's headaches. *See* T. 156–58. While plaintiff did complain of headaches, it is clear that Dr. Palafox's opinion was given as a result of his conclusions regarding plaintiff's back and leg pain, the effects of which were measured and quantified in the physical therapist's FCE. The neurological evaluation tested neither of these ailments and is, therefore, irrelevant in determining if Dr. Palafox' s opinion regarding plaintiff's back and leg pain is inconsistent with other substantial evidence and irrelevant in determining whether the opinion should be afforded controlling weight.

Despite Dr. Palafox's supported and uncontradicted opinion, the ALJ theorized that plaintiff had sufficiently recovered within twelve months of her injury to do sedentary work. *See* T. 13 ("I have concluded that, within twelve months of the injury, [plaintiff] *regained* the physical capacity for a full range of sedentary work activity ....") (emphasis added). This conclusion is clearly inconsistent with the medical record. In August 2000, Dr. Palafox described plaintiff's medical condition as "stable" and not expected to improve

(T. 162). Notably, the doctor did not then—or ever—change his order for plaintiff not to return to work or his stated opinion that plaintiff was unable to return to gainful employment. Further detracting from the ALJ's conclusion are Dr. Palafox's letters of December 2000, March 2001, and April 2001, which describe plaintiff's condition as having "deteriorat[ed]" and her ailments as "progressive" (T. 218, 223). The doctor even suggested in one of his last letters that plaintiff may need to undergo surgery (T. 216). In light of these reports, it is hard to understand the basis for the ALJ's determination that plaintiff had recovered sufficiently to work. The ALJ "'cannot arbitrarily substitute his own judgment for competent medical opinion.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) (citing *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983)).

Because the ALJ failed to provide "good reasons" for not affording Dr. Palafox's opinion controlling weight, this matter is remanded for further proceedings. On remand the Commissioner should examine the medical opinions described above and further develop the record as appropriate.

### B. Evaluating Plaintiff's Credibility

Plaintiff's statements regarding her limitations are to be considered only to the extent that they are consistent with medical evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). If plaintiff's allegations are consistent with medical evidence, the Commissioner must then evaluate the credibility of those allegations. Among other things, the Commissioner is allowed to consider medical treatment history, work history, consistency of the claimant's statements, and personal observations in making this evaluation. *See* Social Security Ruling 96–7p, 1996 WL 374186, *4–7 (S.S.A.). The Commissioner has directed

that "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* at *2; *see, e.g., McCaskill v. Massanari,* 152 F.Supp.2d 270, 274–75 (E.D.N.Y.2001).

■ In the instant case, the ALJ's decision states simply: "If [plaintiff's] allegations actually reflected her retained work abilities, I would find her functional capacity to be for a lesser level of work. By implication, I have found that her subjective complaints are exaggerated ..." (T. 13). At best, this explanation errs in its assessment of the consistency of plaintiff's allegations with the medical evidence (the first step of the credibility determination). There is ample medical evidence to support a conclusion that plaintiff's allegations of pain and impairment were consistent with her ailments. The doctor performing the MRI stated that plaintiff's ailments, "L5–S1 left paracentral annular fissure [and] ... mild degenerative disc disease," could be symptomatic of plaintiff's pain (T. 194). In addition, the first non-examining DDS physician concluded that plaintiff's alleged limitations were supported by medical evidence (T. 151). Only a single non-examining physician concluded otherwise (T. 206). Any finding that plaintiff's subjective complaints of pain are not consistent with her proven medical conditions, therefore, is not supported by substantial evidence.[4]

Even if the ALJ's finding is viewed as assessing the second step of the credibility test, it is little more than a "single, conclusory statement." Although the record appears to contain evidence to support plaintiff's credibility, it is not for this Court to make such a determination. The Commissioner is in a much better position to perform such a nuanced task. *See Crowley v. Barnhart,* 220 F.Supp.2d 176, 181 (W.D.N.Y.2002) (citing *Parker v. Harris,* 626 F.2d 225 (2d Cir.1980)). On remand, however, the Commissioner's ultimate determination of plaintiff's credibility must be adequately substantiated and explained. *See Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir.1982).

### C. Failure to Develop the Record

■ Plaintiff contends that the ALJ failed to develop the record sufficiently to make a determination about the existence of plaintiff's alleged mental disability. This contention lacks merit. The Commis-

---

4. It is important to note that plaintiff's allegations need not be substantiated by medical evidence, but simply consistent with it. The entire purpose of sections 404.1529 and 416.929 is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence. The regulations provide that the Commissioner must first determine only whether the impairments "could reasonably be expected to produce [plaintiff's] pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b); *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) ("Since symptoms sometimes suggest a greater severity of impairment *than can be shown by objective medical evidence alone,* we will carefully consider any other information you may submit about your symptoms.... Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions ..., which can *reasonably be accepted as consistent* with the objective medical evidence and other evidence, will be taken into account ....") (emphasis added). Only allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis. To require plaintiff to fully substantiate her symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose. *See Castillo v. Apfel,* No. 98 CIV. 0792, 1999 WL 147748, *7 (S.D.N.Y. Mar. 18, 1999) (citing *Harrison v. Sec'y of Health & Human Services,* 901 F.Supp. 749, 757 (S.D.N.Y.1995) and *Diaz v. Bowen,* 664 F.Supp. 725, 730 (S.D.N.Y.1987)).

sioner is under an affirmative duty to develop plaintiff's medical record. 20 C.F.R. §§ 404.1512(d), 416.912(d); *Sims,* 530 U.S. at 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Before the Commissioner makes her decision, the record must be sufficiently complete to "make a determination ... about whether [plaintiff is] disabled ...." 20 C.F.R. §§ 404.1512(e), 416.912(e). The Commissioner, however, need not develop the record in areas where there is absolutely no credible evidence, medical or otherwise, that such development is necessary. *See Schaal,* 134 F.3d at 505.

Nowhere in the record is there any credible evidence from either Dr. Palafox, the DDS physicians, plaintiff's physical therapist, or plaintiff herself, that she has a mental disability. Plaintiff attempts to point to her hearing testimony that her concentration was not "like it used to be" and that she was taking medicine for depression (T. 35–36). The ALJ rightly discounted this testimony where there was no evidence to support its truth; there was no medical evidence before the ALJ of any mental health treatment or any indication that such records existed. *Cf. Schaal,* 134 F.3d at 505 (acknowledging the existence of evidence of mental disability in the record, but finding it too insubstantial to pursue further development).

## V. Conclusion

For the foregoing reasons, plaintiff's motion (Dkt.# 6) is granted, the Commissioner's motion (Dkt.# 8) is denied, and the final decision of the Commissioner of Social Security is reversed. Plaintiff's cross-motion for judgment on the pleadings (Dkt.# 12) is, in essence, a response to the Commissioner's motion and, therefore, is denied as moot. This case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g)

for further proceedings consistent with this opinion.

IT IS SO ORDERED.